(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CHAIDEZ *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 11–820. Argued November 1, 2012—Decided February 20, 2013

Immigration officials initiated removal proceedings against petitioner Chaidez in 2009 upon learning that she had pleaded guilty to mail fraud in 2004. To avoid removal, she sought to overturn that conviction by filing a petition for a writ of *coram nobis*, contending that her former attorney's failure to advise her of the guilty plea's immigration consequences constituted ineffective assistance of counsel under the Sixth Amendment. While her petition was pending, this Court held in *Padilla* v. *Kentucky*, 559 U. S. ___, that the Sixth Amendment requires defense attorneys to inform non-citizen clients of the deportation risks of guilty pleas. The District Court vacated Chaidez's conviction, determining that *Padilla* did not announce a "new rule" under *Teague* v. *Lane*, 489 U. S. 288, and thus applied to Chaidez's case. The Seventh Circuit reversed, holding that *Padilla* had declared a new rule and should not apply in a challenge to a final conviction.

*Held*: *Padilla* does not apply retroactively to cases already final on direct review. Pp. 3–15.

(a) Under *Teague,* a person whose conviction is already final may not benefit from a new rule of criminal procedure on collateral review. A "case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U. S., at 301. And a holding is not so dictated unless it would have been "apparent to all reasonable jurists." *Lambrix* v. *Singletary,* 520 U. S. 518, 527−528. At the same time, a case does not "announce a new rule, [when] it [is] merely an application of the principle that governed" a prior decision to a different set of facts. *Teague*, 489 U. S., at 307. Thus, garden-variety applications of the test in *Strickland* v. *Washington*, 466 U. S. 668, for assessing ineffec-

tive assistance claims do not produce new rules, *id.,* at 687−688.

But *Padilla* did more than just apply *Strickland*'s general standard to yet another factual situation. Before deciding if failing to inform a client about the risk of deportation "fell below [*Strickland*'s] objective standard of reasonableness," 466 U. S., at 688, *Padilla* first considered the threshold question whether advice about deportation was "categorically removed" from the scope of the Sixth Amendment right to counsel because it involved only a "collateral consequence" of a conviction, rather than a component of a criminal sentence, 559 U. S., at ___. That is, prior to asking *how* the *Strickland* test applied, *Padilla* asked *whether* that test applied at all.

That preliminary question came to the Court unsettled. *Hill* v. *Lockhart*, 474 U. S. 52, had explicitly left open whether the Sixth Amendment right extends to collateral consequences. That left the issue to the state and lower federal courts, and they almost unanimously concluded that the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation. *Padilla*'s contrary ruling thus answered an open question about the Sixth Amendment's reach, in a way that altered the law of most jurisdictions. In so doing, *Padilla* broke new ground and imposed a new obligation. Pp. 3−11.

(b) Chaidez argues that *Padilla* did no more than apply *Strickland* to a new set of facts. But she ignores that *Padilla* had to develop new law to determine that *Strickland* applied at all. The few lower court decisions she cites held only that a lawyer may not affirmatively misrepresent his expertise or otherwise actively mislead his client as to any important matter. Those rulings do not apply to her case, and they do not show that all reasonable judges thought that lawyers had to advise their clients about deportation risks. Neither does *INS* v. *St. Cyr,* 533 U. S. 289, have any relevance here. In saying that a reasonably competent lawyer would tell a non-citizen client about a guilty plea's deportation consequences, *St. Cyr* did not determine that the Sixth Amendment requires a lawyer to provide such information. It took *Padilla* to decide that question. Pp. 11–15.

655 F. 3d 684, affirmed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, BREYER, and ALITO, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–820

ROSELVA CHAIDEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[February 20, 2013]

JUSTICE KAGAN delivered the opinion of the Court.

In *Padilla* v. *Kentucky*, 559 U. S. \_\_\_ (2010), this Court held that the Sixth Amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea. We consider here whether that ruling applies retroactively, so that a person whose conviction became final before we decided *Padilla* can benefit from it. We conclude that, under the principles set out in *Teague* v. *Lane*, 489 U. S. 288 (1989), *Padilla* does not have retroactive effect.

I

Petitioner Roselva Chaidez hails from Mexico, but became a lawful permanent resident of the United States in 1977. About 20 years later, she helped to defraud an automobile insurance company out of $26,000. After federal agents uncovered the scheme, Chaidez pleaded guilty to two counts of mail fraud, in violation of 18 U. S. C. §1341. The District Court sentenced her to four years of probation and ordered her to pay restitution. Chaidez's conviction became final in 2004.

Under federal immigration law, the offenses to which Chaidez pleaded guilty are "aggravated felonies," subject-

ing her to mandatory removal from this country. See 8 U. S. C. §§1101(a)(43)(M)(i), 1227(a)(2)(A)(iii). But according to Chaidez, her attorney never advised her of that fact, and at the time of her plea she remained ignorant of it.

Immigration officials initiated removal proceedings against Chaidez in 2009, after an application she made for citizenship alerted them to her prior conviction. To avoid removal, Chaidez sought to overturn that conviction by filing a petition for a writ of *coram nobis* in Federal District Court.[1] She argued that her former attorney's failure to advise her of the immigration consequences of pleading guilty constituted ineffective assistance of counsel under the Sixth Amendment.

While Chaidez's petition was pending, this Court decided *Padilla.* Our ruling vindicated Chaidez's view of the Sixth Amendment: We held that criminal defense attorneys must inform non-citizen clients of the risks of deportation arising from guilty pleas. See 559 U. S., at ___ (slip op., at 9). But the Government argued that Chaidez could not benefit from *Padilla* because it announced a "new rule" and, under *Teague*, such rules do not apply in collateral challenges to already-final convictions.

The District Court determined that *Padilla* "did not announce a new rule for *Teague* purposes," and therefore should apply to Chaidez's case. 730 F. Supp. 2d 896, 904 (ND Ill. 2010). It then found that Chaidez's counsel had performed deficiently under *Padilla* and that Chaidez suffered prejudice as a result. Accordingly, the court vacated Chaidez's conviction. See No. 03 CR 636–6, 2010

---

[1] A petition for a writ of *coram nobis* provides a way to collaterally attack a criminal conviction for a person, like Chaidez, who is no longer "in custody" and therefore cannot seek habeas relief under 28 U. S. C. §2255 or §2241. See *United States* v. *Morgan*, 346 U. S. 502, 507, 510–511 (1954). Chaidez and the Government agree that nothing in this case turns on the difference between a *coram nobis* petition and a habeas petition, and we assume without deciding that they are correct.

WL 3979664 (ND Ill., Oct. 6, 2010).

The United States Court of Appeals for the Seventh Circuit reversed, holding that *Padilla* had declared a new rule and so should not apply in a challenge to a final conviction. "Before *Padilla*," the Seventh Circuit reasoned, "the [Supreme] Court had never held that the Sixth Amendment requires a criminal defense attorney to provide advice about matters not directly related to [a] client's criminal prosecution," including the risks of deportation. 655 F. 3d 684, 693 (2011). And state and lower federal courts had uniformly concluded that an attorney need *not* give "advice concerning [such a] collateral (as opposed to direct) consequenc[e] of a guilty plea." *Id.*, at 690. According to the Seventh Circuit, *Padilla*'s holding was new because it ran counter to that widely accepted "distinction between direct and collateral consequences." 655 F. 3d, at 691. Judge Williams dissented. Agreeing with the Third Circuit's view, she argued that *Padilla* "broke no new ground" because it merely applied established law about a lawyer's "duty to consult" with a client. 655 F. 3d, at 695 (quoting *United States* v. *Orocio*, 645 F. 3d 630, 638–639 (CA3 2011) (internal quotation marks omitted)).

We granted certiorari, 566 U. S. \_\_\_ (2012), to resolve a split among federal and state courts on whether *Padilla* applies retroactively.[2] Holding that it does not, we affirm the Seventh Circuit.

## II

*Teague* makes the retroactivity of our criminal proce-

─────────────

[2] Compare 655 F. 3d 684 (CA7 2011) (case below) (not retroactive); *United States* v. *Amer*, 681 F. 3d 211 (CA5 2012) (same); *United States* v. *Chang Hong*, 671 F. 3d 1147 (CA10 2011) (same); *State* v. *Gaitan*, 209 N. J. 339, 37 A. 3d 1089 (2012) (same), with *United States* v. *Orocio*, 645 F. 3d 630 (CA3 2011) (retroactive); *Commonwealth* v. *Clarke*, 460 Mass. 30, 949 N. E. 2d 892 (2011) (same).

dure decisions turn on whether they are novel. When we announce a "new rule," a person whose conviction is already final may not benefit from the decision in a habeas or similar proceeding.[3] Only when we apply a settled rule may a person avail herself of the decision on collateral review. Here, Chaidez filed her *coram nobis* petition five years after her guilty plea became final. Her challenge therefore fails if *Padilla* declared a new rule.

"[A] case announces a new rule," *Teague* explained, "when it breaks new ground or imposes a new obligation" on the government. 489 U. S., at 301. "To put it differently," we continued, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Ibid.* And a holding is not so dictated, we later stated, unless it would have been "apparent to all reasonable jurists." *Lambrix* v. *Singletary*, 520 U. S. 518, 527–528 (1997).

But that account has a flipside. *Teague* also made clear that a case does *not* "announce a new rule, [when] it '[is] merely an application of the principle that governed'" a prior decision to a different set of facts. 489 U. S., at 307 (quoting *Yates* v. *Aiken*, 484 U. S. 211, 217 (1988)). As JUSTICE KENNEDY has explained, "[w]here the beginning point" of our analysis is a rule of "general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Wright* v. *West*, 505 U. S. 277, 309 (1992) (concurring in judgment); see also *Williams* v. *Taylor*, 529 U. S. 362, 391 (2000). Otherwise said, when all we do is apply a general standard to the kind of factual

---

[3] *Teague* stated two exceptions: "[W]atershed rules of criminal procedure" and rules placing "conduct beyond the power of the [government] to proscribe" apply on collateral review, even if novel. 489 U. S., at 311 (internal quotation marks omitted). Chaidez does not argue that either of those exceptions is relevant here.

circumstances it was meant to address, we will rarely state a new rule for *Teague* purposes.

Because that is so, garden-variety applications of the test in *Strickland* v. *Washington*, 466 U. S. 668 (1984), for assessing claims of ineffective assistance of counsel do not produce new rules. In *Strickland*, we held that legal representation violates the Sixth Amendment if it falls "below an objective standard of reasonableness," as indicated by "prevailing professional norms," and the defendant suffers prejudice as a result. *Id.*, at 687–688. That standard, we later concluded, "provides sufficient guidance for resolving virtually all" claims of ineffective assistance, even though their particular circumstances will differ. *Williams*, 529 U. S., at 391. And so we have granted relief under *Strickland* in diverse contexts without ever suggesting that doing so required a new rule. See, *e.g.*, *ibid.*; *Rompilla* v. *Beard*, 545 U. S. 374 (2005); *Wiggins* v. *Smith*, 539 U. S. 510 (2003).[4] In like manner, *Padilla* would not have created a new rule had it only applied *Strickland*'s general standard to yet another factual situation—that is, had *Padilla* merely made clear that a lawyer who neglects to inform a client about the risk of deportation is professionally incompetent.

But *Padilla* did something more. Before deciding if failing to provide such advice "fell below an objective standard of reasonableness," *Padilla* considered a threshold question: Was advice about deportation "categorically removed" from the scope of the Sixth Amendment right to counsel because it involved only a "collateral consequence" of a conviction, rather than a component of the criminal

––––––––––

[4] We did not consider *Teague* in *Williams*, *Rompilla*, and *Wiggins,* but we granted habeas relief pursuant to 28 U. S. C. §2254(d)(1) because state courts had unreasonably applied "clearly established" law. And, as we have explained, "clearly established" law is not "new" within the meaning of *Teague*. See *Williams*, 529 U. S., at 412.

sentence? 559 U. S., at ___ (slip op., at 7–9).[5]  In other words, prior to asking *how* the *Strickland* test applied ("Did this attorney act unreasonably?"), *Padilla* asked *whether* the *Strickland* test applied ("Should we even evaluate if this attorney acted unreasonably?").  And as we will describe, that preliminary question about *Strickland*'s ambit came to the *Padilla* Court unsettled—so that the Court's answer ("Yes, *Strickland* governs here") required a new rule.

The relevant background begins with our decision in *Hill* v. *Lockhart*, 474 U. S. 52 (1985), which explicitly left open whether advice concerning a collateral consequence must satisfy Sixth Amendment requirements.  Hill pleaded guilty to first-degree murder after his attorney misinformed him about his parole eligibility.  In addressing his claim of ineffective assistance, we first held that the *Strickland* standard extends generally to the plea process.  See *Hill*, 474 U. S., at 57.  We then determined, however, that Hill had failed to allege prejudice from the lawyer's error and so could not prevail under that standard.  See *id.*, at 60.  That conclusion allowed us to avoid another, more categorical question: whether advice about parole (however inadequate and prejudicial) could possibly violate the Sixth Amendment.  The Court of Appeals, we noted, had held "that parole eligibility is a collateral rather than a direct consequence of a guilty plea, of which a defendant need not be informed."  *Id.*, at 55.  But our ruling on prejudice made "it unnecessary to determine whether there may be circumstances under which" ad-

––––––––––

[5] We have never attempted to delineate the world of "collateral consequences," see *Padilla*, 559 U. S., at ___, n. 8 (slip op., at 7, n. 8), nor do we do so here.  But other effects of a conviction commonly viewed as collateral include civil commitment, civil forfeiture, sex offender registration, disqualification from public benefits, and disfranchisement.  See *id.*, at ___ (ALITO, J., concurring in judgment) (slip op., at 2–3) (listing other examples).

vice about a matter deemed collateral violates the Sixth Amendment. *Id.*, at 60.[6]

That non-decision left the state and lower federal courts to deal with the issue; and they almost unanimously concluded that the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation. All 10 federal appellate courts to consider the question decided, in the words of one, that "counsel's failure to inform a defendant of the collateral consequences of a guilty plea is never" a violation of the Sixth Amendment. *Santos-Sanchez* v. *United States*, 548 F. 3d 327, 334 (CA5 2008).[7] That constitutional guarantee, another typical decision expounded, "assures an accused of effective assistance of counsel in *'criminal prosecutions'*"; accordingly, advice about matters like deportation, which are "not a part of or enmeshed in the criminal proceeding," does not fall within the Amendment's scope. *United States* v. *George*, 869 F. 2d 333, 337 (CA7 1989). Appellate courts in almost 30 States agreed.[8]

———————

[6] In saying that much, we declined to rule not only on whether advice about a conviction's collateral consequences falls outside the Sixth Amendment's scope, but also on whether parole eligibility should be considered such a consequence, as the court of appeals held.

[7] See *Broomes* v. *Ashcroft*, 358 F. 3d 1251, 1256 (CA10 2004); *United States* v. *Fry*, 322 F. 3d 1198, 1200–1201 (CA9 2003); *United States* v. *Gonzalez*, 202 F. 3d 20, 25 (CA1 2000); *Russo* v. *United States*, 1999 WL 164951, \*2 (CA2, Mar. 22, 1999); *Ogunbase* v. *United States*, 1991 WL 11619, \*1 (CA6, Feb. 5, 1991); *United States* v. *Del Rosario*, 902 F. 2d 55, 58–59 (CADC 1990); *United States* v. *George*, 869 F. 2d 333, 337 (CA7 1989); *United States* v. *Yearwood*, 863 F. 2d 6, 7–8 (CA4 1988); *United States* v. *Campbell*, 778 F. 2d 764, 768–769 (CA11 1985).

[8] *Rumpel* v. *State*, 847 So. 2d 399, 402–405 (Ala. Crim. App. 2002); *Tafoya* v. *State*, 500 P. 2d 247, 252 (Alaska 1972); *State* v. *Rosas*, 183 Ariz. 421, 423, 904 P. 2d 1245, 1247 (App. 1995); *Niver* v. *Commissioner of Correction*, 101 Conn. App. 1, 3–5, 919 A. 2d 1073, 1075–1076 (2007) (*per curiam*); *State* v. *Christie*, 655 A. 2d 836, 841 (Del. Super. 1994); *Matos* v. *United States*, 631 A. 2d 28, 31–32 (D. C. 1993); *Major* v. *State*, 814 So. 2d 424, 431 (Fla. 2002); *People* v. *Huante*, 143 Ill. 2d 61, 68–71,

By contrast, only two state courts held that an attorney could violate the Sixth Amendment by failing to inform a client about deportation risks or other collateral consequences of a guilty plea.[9]  That imbalance led the authors of the principal scholarly article on the subject to call the exclusion of advice about collateral consequences from the Sixth Amendment's scope one of "the most widely recognized rules of American law."  Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 706 (2002).[10]

———————

571 N. E. 2d 736, 740–741 (1991); *State* v. *Ramirez*, 636 N. W. 2d 740, 743–746 (Iowa 2001); *State* v. *Muriithi*, 273 Kan. 952, 961, 46 P. 3d 1145, 1152 (2002); *Commonwealth* v. *Fuartado*, 170 S. W. 3d 384, 385–386 (Ky. 2005); *State* v. *Montalban*, 2000–2739, p. 4 (La. 2/26/02), 810 So. 2d 1106, 1110; *Commonwealth* v. *Fraire*, 55 Mass. App. 916, 917, 774 N. E. 2d 677, 678–679 (2002); *People* v. *Davidovich*, 463 Mich. 446, 452, 618 N. W. 2d 579, 582 (2000) (*per curiam*); *State ex rel. Nixon* v. *Clark*, 926 S. W. 2d 22, 25 (Mo. App. 1996); *State* v. *Zarate*, 264 Neb. 690, 693–696, 651 N. W. 2d 215, 221–223 (2002); *Barajas* v. *State*, 115 Nev. 440, 441–442, 991 P. 2d 474, 475–476 (1999) (*per curiam*); *State* v. *Chung*, 210 N. J. Super. 427, 434, 510 A. 2d 72, 76 (App. Div. 1986); *People* v. *Ford*, 86 N. Y. 397, 403–404, 657 N. E. 2d 265, 268–269 (1995); *State* v. *Dalman*, 520 N. W. 2d 860, 863–864 (N. D. 1994); *Commonwealth* v. *Frometa*, 520 Pa. 552, 555–557, 555 A. 2d 92, 93–94 (1989); *State* v. *Alejo*, 655 A. 2d 692, 692–693 (R. I. 1995); *Nikolaev* v. *Weber*, 2005 S. D. 100, ¶¶11–12, 705 N. W. 2d 72, 75–77 (*per curiam*); *Bautista* v. *State*, 160 S. W. 3d 917, 922 (Tenn. Crim. App. 2004); *Perez* v. *State*, 31 S. W. 3d 365, 367–368 (Tex. App. 2000); *State* v. *Rojas-Martinez*, 2005 UT 86, ¶¶15–20, 125 P. 3d 930, 934–935; *State* v. *Martinez-Lazo*, 100 Wash. App. 869, 876–878, 999 P. 2d 1275, 1279–1280 (2000); *State* v. *Santos*, 136 Wis. 2d 528, 531, 401 N. W. 2d 856, 858 (App. 1987).

[9] *People* v. *Pozo*, 746 P. 2d 523, 527–529 (Colo. 1987); *State* v. *Paredez*, 2004–NMSC–036, ¶¶17–19, 136 N. M. 533, 539, 101 P. 3d 799, 805.

[10] The dissent is therefore wrong to claim that we emphasize "the absence of lower court authority" holding that an attorney's failure to advise about deportation violated the Sixth Amendment.  *Post*, at 10 (opinion of SOTOMAYOR, J.).  We instead point to the *presence* of lower court authority—in case after case and jurisdiction after jurisdiction— holding that such a failure, because relating to a collateral matter,

So when we decided *Padilla*, we answered a question about the Sixth Amendment's reach that we had left open, in a way that altered the law of most jurisdictions—and our reasoning reflected that we were doing as much. In the normal *Strickland* case, a court begins by evaluating the reasonableness of an attorney's conduct in light of professional norms, and then assesses prejudice. But as earlier indicated, see *supra,* at 5–6, *Padilla* had a different starting point. Before asking whether the performance of Padilla's attorney was deficient under *Strickland*, we considered (in a separately numbered part of the opinion) whether *Strickland* applied at all. See 559 U. S., at \_\_\_ (slip op., at 7–9). Many courts, we acknowledged, had excluded advice about collateral matters from the Sixth Amendment's ambit; and deportation, because the consequence of a distinct civil proceeding, could well be viewed as such a matter. See *id.,* at \_\_\_ (slip op., at 7). But, we continued, no decision of our own committed us to "appl[y] a distinction between direct and collateral consequences to define the scope" of the right to counsel. *Id.,* at \_\_\_ (slip op., at 8). And however apt that distinction might be in other contexts, it should not exempt from Sixth Amendment scrutiny a lawyer's advice (or non-advice) about a plea's deportation risk. Deportation, we stated, is "unique." *Ibid.* It is a "particularly severe" penalty, and one "intimately related to the criminal process"; indeed, immigration statutes make it "nearly an automatic result" of some convictions. *Ibid.* We thus resolved the threshold question before us by breaching the previously chink-free wall between direct and collateral consequences: Notwithstanding the then-dominant view, "*Strickland* applies to Padilla's claim." *Id.,* at \_\_\_ (slip op., at 9).

If that does not count as "break[ing] new ground" or "impos[ing] a new obligation," we are hard pressed to

_____

could not do so.

know what would. *Teague,* 489 U. S., at 301. Before *Padilla,* we had declined to decide whether the Sixth Amendment had any relevance to a lawyer's advice about matters not part of a criminal proceeding. Perhaps some advice of that kind would have to meet *Strickland*'s reasonableness standard—but then again, perhaps not: No precedent of our own "*dictated*" the answer. *Teague,* 489 U. S., at 301. And as the lower courts filled the vacuum, they almost uniformly insisted on what *Padilla* called the "categorica[l] remov[al]" of advice about a conviction's non-criminal consequences—including deportation—from the Sixth Amendment's scope. 559 U. S., at ___ (slip op., at 9). It was *Padilla* that first rejected that categorical approach—and so made the *Strickland* test operative—when a criminal lawyer gives (or fails to give) advice about immigration consequences.[11] In acknowledging that fact, we do not cast doubt on, or at all denigrate, *Padilla.* Courts often need to, and do, break new ground; it is the very premise of *Teague* that a decision can be right and also be novel. All we say here is that *Padilla*'s holding that the failure to advise about a non-criminal conse-

———————

[11] The separate opinions in *Padilla* objected to just this aspect of the Court's ruling. Dissents have been known to exaggerate the novelty of majority opinions; and "the mere existence of a dissent," like the existence of conflicting authority in state or lower federal courts, does not establish that a rule is new. *Beard* v. *Banks,* 542 U. S. 406, 416, n. 5 (2004); see *Williams,* 529 U. S., at 410. But the concurring and dissenting opinions in *Padilla* were on to something when they described the line the Court was crossing. "Until today," JUSTICE ALITO wrote, "the longstanding and unanimous position of the federal courts was that reasonable defense counsel generally need only advise a client about the *direct* consequences of a criminal conviction." See 559 U. S., at ___ (concurring in judgment) (slip op., at 2). Or again, this time from JUSTICE SCALIA: "[U]ntil today," the Sixth Amendment guaranteed only "legal advice directly related to defense against prosecution" of a criminal charge. *Id.,* at ___ (dissenting) (slip op., at 2). One need not agree with any of the separate opinions' criticisms of *Padilla* to concur with their view that it modified governing law.

quence could violate the Sixth Amendment would not have been—in fact, was not—"apparent to all reasonable jurists" prior to our decision. *Lambrix*, 520 U. S., at 527–528. *Padilla* thus announced a "new rule."

## III

Chaidez offers, and the dissent largely adopts, a different account of *Padilla*, in which we did no more than apply *Strickland* to a new set of facts. On Chaidez's view, *Strickland* insisted "[f]rom its inception" that *all* aspects of a criminal lawyer's performance pass a test of "'reasonableness under prevailing professional norms'": The decision thus foreclosed any "categorical distinction between direct and collateral consequences." Brief for Petitioner 21–22 (emphasis deleted) (quoting *Strickland*, 466 U. S., at 688). Indeed, Chaidez contends, courts prior to *Padilla* recognized *Strickland*'s all-encompassing scope and so applied its reasonableness standard to advice concerning deportation. See Brief for Petitioner 25–26; Reply Brief 10–12. She here points to caselaw in three federal appeals courts allowing ineffective assistance claims when attorneys affirmatively misled their clients about the deportation consequences of guilty pleas.[12] The only question left for *Padilla* to resolve, Chaidez claims, was whether professional norms also require criminal lawyers to volunteer advice about the risk of deportation. In addressing that issue, she continues, *Padilla* did a run-of-the-mill *Strickland* analysis. And more: It did an especially easy *Strickland* analysis. We had earlier noted in *INS* v. *St. Cyr*, 533 U. S. 289 (2001)—a case raising an issue of immigration law unrelated to the Sixth Amendment—that a "competent defense counsel" would inform his client about a guilty plea's deportation consequences. *Id.*, at 323, n. 50.

———————

[12] See *United States* v. *Kwan*, 407 F. 3d 1005, 1015–1017 (CA9 2005); *United States* v. *Couto*, 311 F. 3d 179, 188 (CA2 2002); *Downs-Morgan* v. *United States*, 765 F. 2d 1534, 1540–1541 (CA11 1985).

All *Padilla* had to do, Chaidez concludes, was recite that prior finding.

But Chaidez's (and the dissent's) story line is wrong, for reasons we have mostly already noted: *Padilla* had to develop new law, establishing that the Sixth Amendment applied at all, before it could assess the performance of Padilla's lawyer under *Strickland*. See *supra,* at 5–6, 9. Our first order of business was thus to consider whether the widely accepted distinction between direct and collateral consequences categorically foreclosed Padilla's claim, whatever the level of his attorney's performance. We did not think, as Chaidez argues, that *Strickland* barred resort to that distinction. Far from it: Even in *Padilla* we did not eschew the direct-collateral divide across the board. See 559 U. S., at ___ (slip op., at 8) ("Whether that distinction is [generally] appropriate is a question we need not consider in this case"). Rather, we relied on the special "nature of deportation"—the severity of the penalty and the "automatic" way it follows from conviction—to show that "[t]he collateral versus direct distinction [was] ill-suited" to dispose of Padilla's claim. *Id.*, at ___ (slip op., at 8–9). All that reasoning came before we conducted a *Strickland* analysis (by examining professional norms and so forth), and none of it followed ineluctably from prior law.[13]

——————

[13] The dissent's entire analysis founders on this most basic point. In its lengthy description of *Padilla*, the dissent picks up in the middle— *after* the Court concluded that the direct-collateral distinction did not preclude finding that Padilla's lawyer provided ineffective assistance under the Sixth Amendment. See *post*, at 3–5. The dissent justifies ignoring that threshold conclusion on the ground that "*Padilla* declined to embrace the . . . distinction between collateral and direct consequences" and "stated very clearly that it found the distinction irrelevant" to the case. *Post*, at 6. But it is exactly in refusing to apply the direct-collateral distinction that the *Padilla* Court did something novel. Before then, as the Court forthrightly acknowledged, that distinction would have doomed Padilla's claim in well-nigh every court in the

Predictably, then, the caselaw Chaidez and the dissent cite fails to support their claim that lower courts "accepted that *Strickland* applied to deportation advice." Brief for Petitioner 25; see *post*, at 8–11. True enough, three federal circuits (and a handful of state courts) held before *Padilla* that misstatements about deportation could support an ineffective assistance claim. But those decisions reasoned only that a lawyer may not affirmatively misrepresent his expertise or otherwise actively mislead his client on any important matter, however related to a criminal prosecution. See, *e.g., United States* v. *Kwan*, 407 F. 3d 1005, 1015–1017 (CA9 2005). They co-existed happily with precedent, from the same jurisdictions (and almost all others), holding that deportation is not "so unique as to warrant an exception to the general rule that a defendant need not be advised of the [collateral] consequences of a guilty plea." *United States* v. *Campbell*, 778 F. 2d 764, 769 (CA11 1985).[14] So at most, Chaidez has shown that a minority of courts recognized a separate rule for material misrepresentations, regardless whether they concerned deportation or another collateral matter. That limited rule does not apply to Chaidez's case. And because it lived in harmony with the exclusion of claims like hers from the Sixth Amendment, it does not establish what she needs to—that all reasonable judges, prior to *Padilla*, thought they were living in a *Padilla*-like world.

Nor, finally, does *St. Cyr* have any relevance here. That

––––––––––

United States. See 559 U. S., at \_\_\_ (slip op., at 7); *supra,* at 9.

[14] See also *Resendiz* v. *Kovensky*, 416 F. 3d 952, 957 (CA9 2005) ("[B]ecause immigration consequences remain collateral, the failure of counsel to advise his client of the potential immigration consequences of a conviction does not violate the Sixth Amendment"); *Russo* v. *United States*, 1999 WL 164951, \*2 ("[C]ounsel cannot be found ineffective for the mere failure to inform a defendant of the collateral consequences of a plea, such as deportation") (relying on *United States* v. *Santelises*, 509 F. 2d 703, 704 (CA2 1975) (*per curiam*)).

decision stated what is common sense (and what we again recognized in *Padilla*): A reasonably competent lawyer will tell a non-citizen client about a guilty plea's deportation consequences because "'[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.'" *Padilla*, 559 U. S., at ___ (slip op., at 10) (quoting *St. Cyr*, 533 U. S., at 322). But in saying that much, *St. Cyr* did not determine that the Sixth Amendment requires a lawyer to provide such information. Courts had held to the contrary not because advice about deportation was insignificant to a client—really, who could think that, whether before or after *St. Cyr*?—but because it concerned a matter collateral to the criminal prosecution.[15] On those courts' view, the Sixth Amendment no more demanded competent advice about a plea's deportation consequences than it demanded competent representation in the deportation process itself. *Padilla* decided that view was wrong. But to repeat: It was *Padilla* that did so. In the years following *St. Cyr*, not a single state or lower federal court considering a lawyer's failure to provide deportation advice

————————

[15] The dissent claims the opposite, averring that lower court "decisions show nothing more than that the underlying professional norms had not yet evolved to require attorneys to provide advice about deportation consequences." *Post*, at 8. But the dissent cannot point to a single decision stating that a lawyer's failure to offer advice about deportation met professional norms; all the decisions instead held that a lawyer's breach of those norms was constitutionally irrelevant because deportation was a collateral consequence. See *supra,* at 7. Had courts in fact considered professional standards in the slew of cases before *Padilla* that presented *Padilla*-like claims, they would have discovered as early as 1968 that the American Bar Association instructed criminal lawyers to advise their non-citizen clients about the risks of deportation. See 3 ABA Project on Standards for Criminal Justice, Standards Relating to Pleas of Guilty §3.2(b), Commentary, p. 71 (App. Draft 1968). The difficulty in upholding such claims prior to *Padilla* had nothing to do with courts' view of professional norms and everything to do with their use of the direct-collateral divide.

abandoned the distinction between direct and collateral consequences, and several courts reaffirmed that divide. See, *e.g., Santos-Sanchez*, 548 F. 3d, at 335–336; *Broomes* v. *Ashcroft*, 358 F. 3d 1251, 1256–1257 (CA10 2004); *United States* v. *Fry*, 322 F. 3d 1198, 1200–1201 (CA9 2003). It took *Padilla* to decide that in assessing such a lawyer's performance, the Sixth Amendment sets the standard.[16]

## IV

This Court announced a new rule in *Padilla*. Under *Teague*, defendants whose convictions became final prior to *Padilla* therefore cannot benefit from its holding. We accordingly affirm the judgment of the Court of Appeals for the Seventh Circuit.

*It is so ordered.*

---

[16] Chaidez makes two back-up arguments in her merits briefs—that *Teague*'s bar on retroactivity does not apply when a petitioner challenges a federal conviction, or at least does not do so when she makes a claim of ineffective assistance. Brief for Petitioner 27–39. But Chaidez did not include those issues in her petition for certiorari. Nor, still more critically, did she adequately raise them in the lower courts. Only her petition for rehearing en banc in the Seventh Circuit at all questioned *Teague*'s applicability, and her argument there—that a "*Teague*-light" standard should apply to challenges to federal convictions— differs from the ones she has made in this Court. See Petition for Rehearing and for Rehearing En Banc in No. 10–3623 (CA7), p. 13. Moreover, we cannot find any case in which a federal court has considered Chaidez's contention that *Teague* should not apply to ineffective assistance claims. "[M]indful that we are a court of review, not of first view," we decline to rule on Chaidez's new arguments. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).

# SUPREME COURT OF THE UNITED STATES

———————

No. 11–820

———————

## ROSELVA CHAIDEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[February 20, 2013]

JUSTICE THOMAS, concurring in the judgment.

In *Padilla* v. *Kentucky*, 559 U. S. 356 (2010), this Court held that the Sixth Amendment requires an attorney for a criminal defendant to apprise his client of the risk of deportation created by a guilty plea. I dissented. The Sixth Amendment provides that "[i]n all criminal prosecutions," an accused enjoys the right "to have the Assistance of Counsel for his defence." By its terms, this right extends "to legal advice directly related to defense against prosecution of the charged offense," and "[t]here is no basis in text or in principle" to expand the reach of this guarantee to guidance concerning the collateral consequences of a guilty plea. *Id.*, at \_\_\_ (slip op., at 2–3) (SCALIA, J., dissenting). Today, the Court finds that *Padilla* announced a new rule of constitutional law and that, under our decision in *Teague* v. *Lane*, 489 U. S. 288 (1989), "defendants whose convictions became final prior to *Padilla* therefore cannot benefit from its holding." *Ante,* at 15. I continue to believe that *Padilla* was wrongly decided and that the Sixth Amendment does not extend—either prospectively or retrospectively—to advice concerning the collateral consequences arising from a guilty plea. I, therefore, believe that the *Teague* analysis is unnecessary and thus concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

<hr>

No. 11–820

<hr>

## ROSELVA CHAIDEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[February 20, 2013]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG
joins, dissenting.

The Court holds today that *Padilla* v. *Kentucky*, 559
U. S. \_\_\_ (2010), announced a "new" rule within the mean-
ing of *Teague* v. *Lane*, 489 U. S. 288, 301 (1989), and so
does not apply to convictions that became final before its
announcement. That is wrong, because *Padilla* did noth-
ing more than apply the existing rule of *Strickland* v.
*Washington*, 466 U. S. 668 (1984), in a new setting, the
same way the Court has done repeatedly in the past: by
surveying the relevant professional norms and conclud-
ing that they unequivocally required attorneys to provide
advice about the immigration consequences of a guilty
plea. Because *Padilla* fell squarely within the metes and
bounds established by *Strickland*, I respectfully dissent.

### I
### A

The majority correctly sets forth the governing legal
principles under *Teague* and *Strickland*. *Ante,* at 4–5.
The *Teague* inquiry turns centrally on the "nature of the
rule" in question, and for that reason, "[w]here the begin-
ning point is a rule of . . . general application, . . . it will be
the infrequent case that yields a result so novel that it
forges a new rule." *Wright* v. *West*, 505 U. S. 277, 308–309
(1992) (KENNEDY, J., concurring in judgment); see *ante,* at

4–5. The majority makes the important observation that "when all we do is apply a general standard to the kind of factual circumstances it was meant to address, we will rarely state a new rule." *Ibid.* It makes sense, then, that "garden-variety applications of . . . *Strickland* . . . do not produce new rules." *Ante,* at 5.

In *Strickland*, we did not provide a comprehensive definition of deficient performance, and instead held that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." 466 U. S., at 688. *Strickland*'s reasonableness prong therefore takes its content from the standards by which lawyers judge their professional obligations, *ibid.,* and those standards are subject to change. That is why, despite the many different settings in which it has been applied, we have never found that an application of *Strickland* resulted in a new rule.[1]

Significantly, we have previously found that applications of *Strickland* to new factual scenarios are not barred under 28 U. S. C. §2254(d)(1) of the Antiterrorism and Effective Death Penalty Act (AEDPA). Section 2254(d)(1) precludes habeas relief unless a state court decision violates "clearly established Federal law," which, as relevant here, largely overlaps with the inquiry under *Teague* of whether a decision was "*dictated* by precedent." 489 U. S.,

—————

[1] See, *e.g., Lafler* v. *Cooper*, 566 U. S. ___, ___–___ (2012) (incorrect advice leading to a plea offer's rejection); *Rompilla* v. *Beard*, 545 U. S. 374 (2005) (failure to investigate evidence the prosecution intended to use to prove an aggravating circumstance in a capital case); *Wiggins* v. *Smith*, 539 U. S. 510 (2003) (failure to investigate a defendant's social history in a capital case); *Roe* v. *Flores-Ortega*, 528 U. S. 470 (2000) (failure to consult with a defendant regarding whether to pursue an appeal); *Williams* v. *Taylor*, 529 U. S. 362, 391 (2000) (failure to investigate a defendant's background for the purposes of mitigation evidence in a capital case); *Hill* v. *Lockhart*, 474 U. S. 52 (1985) (failure to provide effective assistance during plea negotiations).

at 301 (plurality opinion).[2]  In *Wiggins* v. *Smith*, 539 U. S. 510, 522 (2003), for example, we found that *Williams* v. *Taylor*, 529 U. S. 362 (2000), "made no new law" when it held that *Strickland* extended to an attorney's responsibility to conduct a background investigation in a capital case. Rather, we explained that "in referring to the ABA Standards for Criminal Justice as guides, [*Williams*] applied the same 'clearly established' precedent of *Strickland* we apply today."  539 U. S., at 522.  Similarly, in *Lafler* v. *Cooper*, 566 U. S. ___, ___, ___–___ (2012) (slip op., at 6, 14–16), we rejected the argument advanced by the Solicitor General that the Sixth Amendment did not extend to advice about a plea offer because it did not impact the fairness of the trial.  Instead, we simply held that *Strickland* applied to this form of attorney misconduct.

In short, where we merely apply *Strickland* in a way that corresponds to an evolution in professional norms, we make no new law.

## B

Contrary to the majority's reconstruction, *Padilla* is built squarely on the foundation laid out by *Strickland*. *Padilla* relied upon controlling precedent.  It began by reciting the basic rule that "[u]nder *Strickland*, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.'"  *Padilla*, 559 U. S., at ___ (slip op., at 9) (quoting *Strickland*, 466 U. S., at 688).  We recognized that "[t]he first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: '[t]he proper measure of

---

[2]AEDPA of course differs from the *Teague* rule in other important respects.  See, *e.g., Greene* v. *Fisher*, 565 U. S. ___, ___ (2011) (slip op., at 5).  But these differences aside, the fact that we have repeatedly found AEDPA cases involving *Strickland* to be controlled by established precedent underscores that the application of *Strickland* in a new context should almost never result in a new rule.

attorney performance remains reasonableness under pre-
vailing professional norms.'" *Padilla*, 559 U. S., at ___ (slip
op., at 9) (quoting *Strickland*, 466 U. S., at 688).

We therefore examined the substantial changes in fed-
eral immigration law that provided the backdrop to the
relevant professional standards. *Padilla*, 559 U. S., at ___
(slip op., at 2–6).   Pursuant to the Immigration Act of
1917, 39 Stat. 889–890, a judge could recommend that a
defendant who had committed a deportable offense not
be removed from the country.   Congress entirely eliminated
this procedure in 1990.   104 Stat. 5050.   Then the Illegal
Immigration Reform and Immigrant Responsibility Act of
1996 (IIRIRA), 110 Stat. 3009–596, abolished the Attor-
ney General's authority to grant discretionary relief from
removal for all but a small number of offenses.   *Padilla*,
559 U. S., at ___ (slip op., at 6).   These changes in immi-
gration law meant that for a noncitizen who committed
a removable offense, "removal [had become] practically
inevitable."   *Ibid.*

In parallel with these developments, the standards of
professional responsibility relating to immigration had
become more demanding.   "For at least the past 15 years,"
we observed in *Padilla*, "professional norms have gener-
ally imposed an obligation on counsel to provide advice on
the deportation consequences of a client's plea."   *Id.,* at ___
(slip op., at 15).   Citing an array of practice guides and
professional responsibility manuals, we noted that "[t]he
weight of prevailing professional norms supports the view
that counsel must advise her client regarding the risk of
deportation."   *Id.,* at ___ (slip op., at 9).   Indeed, "authori-
ties of every stripe—including the American Bar Associa-
tion, criminal defense and public defender organizations,
authoritative treatises, and state and city bar publica-
tions—universally require defense attorneys to advise as
to the risk of deportation consequences for non-citizen
clients."   *Id.,* at ___ (slip op., at 10) (internal quotation

marks omitted).

We drew further support for our conclusion that professional standards required advice about deportation consequences from our decision in *INS* v. *St. Cyr*, 533 U. S. 289 (2001). See *Padilla*, 559 U. S., at ___ (slip op., at 10–11) (citing *St. Cyr*, 533 U. S., at 323). In *St. Cyr*, we had explained that the availability of discretionary relief from removal was critical to a noncitizen's decision to accept a plea offer, and expected counsel to follow the instructions of "numerous practice guides," such as the ABA's Standards for Criminal Justice, to inform themselves of the possible immigration consequences of a plea. *Padilla*, 559 U. S., at ___ (slip op., at 11) (citing *St. Cyr*, 533 U. S., at 323, n. 50); see *id.,* at 322, n. 48. And we there found that many States already required that a trial judge advise defendants of the same. *Ibid. St. Cyr* thus "recognized that 'preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.'" *Padilla*, 559 U. S., at ___ (slip op., at 10) (quoting *St. Cyr*, 533 U. S., at 322).

Our application of *Strickland* in *Padilla* followed naturally from these earlier observations about changes in immigration law and the accompanying evolution of professional norms. When we decided *St. Cyr* and *Padilla*, nothing about *Strickland*'s substance or applicability had changed. The only difference from prior law was that the underlying professional norms had changed such that counsel's failure to give this advice now amounted to constitutionally deficient performance.[3] Both before *Pa-*

_____

[3] Even before IIRIRA and *St. Cyr*, lawyers of course understood that it was good practice to inform clients of the deportation consequences of a plea. See *ante,* at 14, n. 15 (citing 3 ABA Project on Standards for Criminal Justice, Standards Relating to Pleas of Guilty §3.2(b), Commentary, p. 71 (App. Draft 1968)). Following the sea change in immigration law, however, the professional norms had become so established and universally recognized that the measure of constitutionally ade-

*dilla* and after, counsel was obligated to follow the rele-
vant professional norms. It was only because those norms
reflected changes in immigration law that *Padilla* reached
the result it did, not because the Sixth Amendment right
had changed at all.

## II

## A

Accepting that routine applications of *Strickland* do not
result in new rules, the majority nevertheless holds that
*Padilla* went a step further. In its view, *Padilla* "'br[oke]
new ground'" by addressing the threshold question of
whether advice about deportation is a collateral conse-
quence of a criminal conviction that falls within the scope
of the Sixth Amendment. *Ante,* at 9–10. But that is
wrong, because *Padilla* declined to embrace the very
distinction between collateral and direct consequences of a
criminal conviction that the majority says it did. In fact,
the Court stated very clearly that it found the distinction
irrelevant for the purposes of determining a defense law-
yer's obligation to provide advice about the immigration
consequences of a plea. 559 U. S., at ___, n. 8 (slip op.,
at 7, n. 8). We asserted that we had "never applied a dis-
tinction between direct and collateral consequences to
define the scope of constitutionally 'reasonable professional
assistance' required under *Strickland*," and concluded that
"[w]hether that distinction is appropriate *is a question we
need not consider* in this case." *Id.,* at ___ (slip op., at 8)
(emphasis added). The distinction was "ill suited" to the
task at hand, we explained, because deportation has a
"close connection to the criminal process," and is "uniquely
difficult to classify as either a direct or a collateral conse-
quence." *Id.,* at ___ (slip op., at 8–9). Indeed, "[o]ur law

─────────

quate performance now included giving such advice in the form *Padilla*
recognized. See 559 U. S., at ___ (slip op., at 10).

ha[d] enmeshed criminal convictions and the penalty of deportation for nearly a century," and we had "long recognized" that deportation is "particularly severe." *Id.*, at \_\_\_ (slip op., at 8).[4]

At bottom, then, the majority's argument hinges upon a distinction the Court has never embraced and that *Padilla* found irrelevant to the issue it ultimately decided. Without this revision to our recent decisional history, the majority's analysis unravels.

## B

The majority finds that the "legal landscape," *Graham* v. *Collins*, 506 U. S. 461, 468 (1993), before *Padilla* was nearly uniform in its rejection of *Strickland*'s application to the deportation consequences of a plea. *Ante,* at 7–10. It concludes that the lower courts were generally in agreement that the Sixth Amendment did not require attorneys to inform clients of the collateral consequences of a plea, and that this weighs heavily in favor of finding that *Padilla* announced a new rule. *Ante*, at 7–8, nn. 7, 8. But the majority's discussion of these precedents operates at too high a level of generality and fails to account for the

_____

[4] See, *e.g., INS* v. *St. Cyr,* 533 U. S. 289, 322 (2001) (noting that "[p]reserving the client's right to remain in the United States may be more important . . . than any potential jail sentence" (internal quotation marks omitted)); *Jordan* v. *De George*, 341 U. S. 223, 243 (1951) (Jackson, J., dissenting) (deportation proceedings "practically . . . are [criminal] for they extend the criminal process of sentencing to include on the same convictions an additional punishment"); *Fong Haw Tan* v. *Phelan*, 333 U. S. 6, 10 (1948) ("[D]eportation is a drastic measure and at times the equivalent of banishment or exile"); *Ng Fung Ho* v. *White*, 259 U. S. 276, 284 (1922) (deportation may result in "loss of both property and life; or of all that makes life worth living"); *Fong Yue Ting* v. *United States*, 149 U. S. 698, 740 (1893) (Brewer, J., dissenting) ("Every one knows that to be forcibly taken away from home, and family, and friends, and business, and property, and sent across the ocean to a distant land, is punishment; and that oftentimes most severe and cruel").

development of professional standards over time. *St. Cyr*
noted the importance of advising clients about immigra-
tion consequences was of recent vintage, indeed more re-
cent than some of the cases the majority cites. See 533
U. S., at 322–323. The Court relies upon decisions issued
over a period that spans more than 30 years. See *ante*, at
7–8, nn. 7, 8. Nearly half of them (17) were decided before
the enactment of IIRIRA. See *ibid.* And all but two of
the Federal Court of Appeals cases were decided before *St.
Cyr*. See *ante,* at 7–8, nn. 7, 8. These earlier decisions
show nothing more than that the underlying professional
norms had not yet evolved to require attorneys to provide
advice about deportation consequences.

Cases from the period following IIRIRA and *St. Cyr*
undermine the majority's generalizations about the state
of the law before *Padilla*. Deportation had long been un-
derstood by lower courts to present "the most difficult"
penalty to classify as either a collateral or direct conse-
quence. *United States* v. *Russell,* 686 F. 2d 35, 38 (CADC
1982); cf. *Janvier* v. *United States*, 793 F. 2d 449, 455
(CA2 1986) (holding that *Strickland* applied to advice
about a judicial recommendation against deportation).
Eventually, and in parallel with changes in federal immi-
gration law and the corresponding professional norms, the
lower courts had acknowledged an important qualification
to the collateral consequences rule. After the passage of
IIRIRA and this Court's decision in *St. Cyr*, many courts
concluded that a lawyer's affirmative misstatements about
the immigration consequences of a guilty plea can consti-
tute deficient performance under *Strickland.* Indeed, each
Federal Court of Appeals to address the question after *St.
Cyr* so held. See *United States* v. *Couto*, 311 F. 3d 179,
188 (CA2 2002); *United States* v. *Kwan*, 407 F. 3d 1005,
1015 (CA9 2005); cf. *Downs-Morgan* v. *United States*, 765

F. 2d 1534, 1540–1541 (CA11 1985).[5]  State-court decisions from this period were in accord and relied upon similar reasoning.[6]

These decisions created an important exception to the collateral/direct consequences distinction.  They also foreshadowed the Court's reasoning in *Padilla* by basing their analysis of the relevant professional norms on the special nature of deportation, the ABA standards governing immigration practice, and the Court's assessment of those standards in *St Cyr*.  See *Kwan*, 407 F. 3d, at 1016 ("That counsel may have misled [the defendant] out of ignorance is no excuse.  It is a basic rule of professional conduct that a lawyer must . . . [remain] abreast of changes in the law and its practice. . . .  Counsel's performance . . . fell below the [ABA]'s ethical standard for criminal defense attorneys with respect to immigration consequences.  The Supreme Court noted this standard in [*St. Cyr*]"); *Couto*, 311 F. 3d, at 187–191 (citing *St. Cyr* and the relevant ABA standards, and concluding that "recent Supreme Court authority supports [a] broader view of attorney responsibility" that encompasses affirmative misrepresentations

---

[5] See *United States* v. *Mora-Gomez*, 875 F. Supp. 1208, 1212 (ED Va. 1995) ("[T]he clear consensus is that an affirmative misstatement regarding deportation may constitute ineffective assistance").

[6] See *Rubio* v. *State*, 124 Nev. 1032, 1041, 194 P. 3d 1224, 1230 (2008) (*per curiam*) ("Like other jurisdictions, we recognize the particularly harsh and penal nature of deportation.  The Supreme Court of the United States has described deportation as 'a drastic measure and at times the equivalent of banishment or exile' and further depicted it as 'a penalty.' . . . Perhaps understanding the harshness of deportation, a growing number of jurisdictions have adopted the affirmative misrepresentation exception to the collateral consequence rule"); *People* v. *Correa*, 108 Ill. 2d 541, 550–552, 485 N. E. 2d 307, 311 (1985); *People* v. *McDonald*, 1 N. Y. 3d 109, 113–115, 802 N. E. 2d 131, 134–135 (2003); see also *Alguno* v. *State*, 892 So. 2d 1200, 1201 (Fla. App. 2005) (*per curiam*); *State* v. *Rojas-Martinez*, 2005 UT 86 ¶¶ 15–20, 125 P. 3d 930, 933–935; *In re Yim*, 139 Wash. 2d 581, 588, 989 P. 2d 512, 516 (1999).

about deportation consequences); see also *Downs-Morgan*, 765 F. 2d, at 1541 ("[D]eportation and exclusion [are] harsh consequences").

The majority believes that these decisions did not meaningfully alter the state of the law in the lower courts before *Padilla*, because they merely applied the age-old principle that a lawyer may not affirmatively mislead a client. *Ante,* at 12–13. But, as explained, the reasoning of these cases renders that characterization at best incomplete. See, *e.g., Kwan*, 407 F. 3d, at 1016. While these lower court precedents are consistent with the general principle that attorneys should not mislead clients by providing incorrect advice, they did not rest primarily on that rule. Rather, they recognized the significant changes in professional norms that predated *Padilla* and that we had noted in *St. Cyr.* As a consequence, the "wall between direct and collateral consequences" that the lower courts had erected, *ante*, at 9, had already been dealt a serious blow by the time the Court decided *Padilla.*

As the majority points out, these misrepresentation cases stopped short of imposing an affirmative obligation on lawyers to consult with clients about the consequences of deportation. *Ante,* at 12–13. But the majority places too much emphasis on the absence of lower court authority finding that an attorney's omissions with respect to deportation resulted in ineffective assistance. The distinction between omissions and affirmative misrepresentations on which these lower court cases depended cannot be reconciled with *Strickland.* In *Padilla* itself, we rejected the Solicitor General's suggestion that *Strickland* should apply to advice about the immigration consequences of a plea only in cases where defense counsel makes an affirmative misstatement. *Padilla*, 559 U. S., at ___ (slip op., at 12). We did so because we found that *Strickland* was incompatible with the distinction between an obligation to give advice and a prohibition on affirmative misstate-

ments. 559 U. S., at \_\_\_ (slip op., at 12–13) (citing *Strickland*, 466 U. S., at 690). *Strickland* made clear that its standard of attorney performance applied to both "acts" and "omissions," and that a rule limiting the performance inquiry to one or the other was too narrow. 466 U. S., at 690. Thus, the distinction between misrepresentations and omissions, on which the majority relies in classifying lower court precedent, implies a categorical rule that is inconsistent with *Strickland*'s requirement of a case-by-case assessment of an attorney's performance.[7]  *Id.*, at 688–689; see, *e.g., Roe* v. *Flores-Ortega*, 528 U. S. 470, 479 (2000). In short, that some courts have differentiated between misleading by silence and affirmative misrepresentation hardly establishes the rationality of the distinction. Notably, the Court offers no reasoned basis for believing that such a distinction can be extracted from *Strickland.*

To be sure, lower courts did continue to apply the distinction between collateral and direct consequences after *St. Cyr.* See *ante,* at 13–14; see, *e.g., Broomes* v. *Ashcroft*, 358 F. 3d 1251, 1256–1257 (CA10 2004). Even so, and even assuming the misrepresentation cases did not call the distinction into question, the existence of these lower court decisions is not dispositive. "[T]he standard for determining when a case establishes a new rule is 'objective,' and the mere existence of conflicting authority does

————————

[7]The majority cites a law review article for the proposition that the categorical consequences rule is "one of 'the most widely recognized rules of American law.'" *Ante,* at 8 (quoting Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 706 (2002)). But the article was, in fact, quite critical of the rule. The authors explained that "[t]he real work of the conviction is performed by the collateral consequences," and that the direct/collateral distinction in the context of ineffective-assistance claims was "surprising because it seems inconsistent with the framework that the Supreme Court . . . laid out" in *Strickland.* Chin & Holmes, at 700–701.

not necessarily mean a rule is new." *Wright*, 505 U. S., at 304 (O'Connor, J., concurring in judgment) (citing *Stringer* v. *Black*, 503 U. S. 222, 237 (1992)); see *Graham* v. *Collins*, 506 U. S. 461, 506 (1993) (Souter, J., dissenting).

Where the application of *Strickland* was straightforward, rooted in 15 years of professional standards and the Court's prior *St. Cyr* decision, there is no reason to put these lower court cases, many from more than a decade earlier, ahead of this Court's simple and clear reasoning in *Padilla.* Nevertheless, the majority reaches the paradoxical conclusion that by declining to apply a collateral-consequence doctrine the Court had never adopted, *Padilla* announced a new rule.

### III

What truly appears to drive the majority's analysis is its sense that *Padilla* occasioned a serious disruption in lower court decisional reasoning. See, *e.g., ante,* at 9–10 ("If that does not count as 'break[ing] new ground' . . . we are hard pressed to know what would" (quoting *Teague*, 489 U. S., at 301)). The concurring and dissenting opinions in *Padilla* similarly reflected the impression that it was a significant and destabilizing decision. See 559 U. S., at ___ (ALITO, J., concurring in judgment) (slip op., at 3); *id.,* at ___ (SCALIA, J., dissenting) (slip op., at 5) (describing the majority opinion as a "sledge hammer"); *ante,* at 8–9, n. 10. But the fact that a decision was perceived as momentous or consequential, particularly by those who disagreed with it, does not control in the *Teague* analysis. Faithfully applying the *Teague* rule depends instead on an examination of this Court's reasoning and an objective assessment of the precedent at issue. *Stringer*, 503 U. S., at 237. In *Padilla*, we did nothing more than apply *Strickland*. By holding to the contrary, today's decision deprives defendants of the fundamental protection of *Strickland*, which requires that lawyers comply with professional norms

with respect to any advice they provide to clients.

*     *     *

Accordingly, I would reverse the judgment of the Seventh Circuit and hold that *Padilla* applies retroactively on collateral review to convictions that became final before its announcement. With respect, I dissent.